IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

OLU KANNI SANYAOLU,

Defendant.

CRIMINAL CASE NO.

1:16-CR-00126-WSD-JFK

## **REPORT AND RECOMMENDATION**

Pending before the court is Defendant Olu Kanni Sanyaolu's motion [Doc. 14] for a bill of particulars and the Government's response [Doc. 36] in opposition thereto, which the court will address *infra*, in Section III.  The court will first address, in Sections I and II, Defendant's motion [Doc. 13] to suppress statements, also pending before the court.  Those statements were made during a secondary border inspection at the George Bush Intercontinental Airport, Houston, Texas, on April 21, 2014, and during a non-custodial interview on October 14, 2015, at the office of Homeland Security Investigations, located in East Point, Georgia.  Evidentiary hearings were held on the motion to suppress on June 22, 2016 [Doc. 24][1] and on August 12, 2016 [Doc.

_____

[1]Citations to the transcript of the June hearing are:  (6/22/16 Tr. at ).

29].[2] Defendant contends that during the secondary inspection conducted on April 21, 2014, he was subjected to custodial interrogation without being advised of his Miranda rights and that all statements he made should be suppressed and that, additionally, any statements that he made were involuntary. [Doc. 33 at 8-13]. Defendant also contends that, although not in custody during the interview conducted on October 14, 2015, the statements that he made are not admissible because, due to the misleading conduct by the government, his statements were involuntary. [Id. at 13-14]. The Government opposes the motion to suppress asserting that Defendant was not in custody on April 21, 2014, requiring Miranda warnings during the secondary inspection and questioning and, even if Defendant was in custody, that he was advised of and waived his Miranda rights. [Doc. 7-12]. The Government also contends that Defendant's statements on April 21, 2014, and on October 14, 2015, were voluntary. [Id. at 12-13]. After consideration of the totality of the circumstances during both of Defendant's encounters with government officers and agents and of the apposite legal authority, the court recommends that Defendant's motion to suppress be denied.

---

[2]Citations to the transcript of the August hearing are:  (8/12/16 Tr. at ).

2

## I.      Facts

On April 21, 2014, in the morning,[3] Defendant Sanyaolu arrived at the George Bush Intercontinental Airport on an international flight from Lagos, Nigeria.  (6/22/16 Tr. at 17, 25-26).  When Defendant, as is true of all international passengers, arrived and deplaned, he proceeded to the primary United States Customs border control checkpoint for processing and to verify the documents presented to enter the United States.  The same process is followed for holders of United States and foreign passports.  (6/22/16 Tr. at 5-6, 24).  If any questions are raised regarding admissibility due to the documents presented at primary inspection, then the passenger, whether an United States or foreign citizen, is referred to secondary inspection for further inquiry. (6/22/16 Tr. at 6-7).

The secondary inspection area is located down a hallway, and individuals referred for further inspection are escorted to a large waiting area, seating approximately fifty individuals and usually occupied by a number of individuals referred for secondary inspection.  (6/22/16 Tr. at 7-9).  The door to the waiting area is locked for security purposes and because individuals with outstanding warrants or

---

[3]Based on the events recounted at the hearing discussed *infra*, the court extrapolates that the international flight arrived prior to 9:00 a.m. that day.

3

questions regarding admissibility into the United States are not free to wander around immigration and custom inspection areas. (6/22/16 Tr. at 8-9). Within the secondary inspection area, there are nine interview rooms, with doors that close but do not lock, in which Customs and Border Patrol ("CBP") enforcement officers conduct further inquiries regarding an individual's admissibility into the United States. The rooms are approximately 8 x 8, with a desk, chairs, monitor and fingerprint equipment. (6/22/16 Tr. at 9-11, 28).

On April 14, 2014, Defendant Sanyaolu was referred to secondary inspection for further questioning regarding his use of another person's identity when previously entering the United States. (6/22/16 Tr. at 17, 24-25). CBP enforcement officer Fernando Guajardo[4] conducted the interview with Defendant in one of the interview rooms, closing but not locking the door. (6/22/16 Tr. at 17-18, 28). Officer Guarjardo first identified himself and then obtained Defendant's fingerprints and name in order to be sure that he was the individual matching the existing file on record which triggered the referral to secondary inspection. The fingerprints matched those on

---

[4]Officer Guajardo, who worked at the airport in this capacity for over ten years, was attired in his uniform, with a holstered firearm, magazine, and handcuffs visible. (6/22/16 Tr. at 4, 36-37). The firearm remained holstered during the interview, and Defendant was not handcuffed nor placed under arrest. (6/22/16 Tr. at 18-19).

record.  (6/22/16 Tr. at 11, 19, 29-30).  Officer Guajardo advised Defendant about the fingerprint match to an alien file number with a different name which Defendant apparently had fraudulently used in the past to enter the United States and informed him that an investigation would be conducted.  Defendant was not advised that he would be charged.  (6/22/16 Tr. at 19, 29-31, 35).  Because Defendant was an United States citizen, he was not going to be detained but released.  (6/22/16 Tr. at 31).

Officer Guajardo testified that, if a referral to secondary inspection might ultimately result in criminal charges, as in the referral involving Defendant Sanyaolu, he gives the interviewee <u>Miranda</u> rights using a Form I-214.  (6/22/16 Tr. at 11-12; Gov't Exh. 1).  The officer, who uses the same procedure in all of his interviews which will not result in an immediate arrest, stated that "[t]o best of [his] knowledge," he used the form with Defendant to advise Defendant of his rights before starting the interview and that Defendant completed the form.[5]  (6/22/16 Tr. at 16, 19, 27-28).  The form states in pertinent part:

> Before we ask you any questions, you must understand your rights.
> You have the right to remain silent.
> Anything you say can be used against you in court, or in any immigration or administrative proceeding.

---

[5]If the interview is subject to immediate arrest, a different form, I-877, is utilized.  (6/22/16 Tr. at 15).

You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time.  You also have the right to stop answering at any time until you talk to a lawyer.

I have read (or have had read to me) this statement of my rights and I understand what my rights are.

(6/22/16 Tr. at 12-13; Gov't Exh. 1).  Officer Guajardo's usual procedure is to read the form to the interviewee.  If the individual understands the rights and signs the form, then the waiver of rights provides, "I am willing to make a statement and answer questions.  I do not want a lawyer at this time.  I understand and know what I am doing.  No promises or threats have been made to me and no pressure or coercion of any kind is being used against me."  (6/22/16 Tr. at 14; Gov't Exh. 2).  Present during the interview was Special Agent Mike Telfer, Homeland Security Investigations ("HSI"), as a required witness to the execution of the form and interview.[6]  (6/22/16 Tr. at 22, 29).

The interview lasted approximately one hour.   (6/22/16 Tr. at 21, 25).  Defendant answered questions, did not appear to be under the influence of drugs or

---

[6]The agent was attired in civil clothing, and if armed, his weapon was concealed under his clothing.  (6/22/16 Tr. at 37).

alcohol, responded appropriately indicating that he understood the questions, and did not appear fatigued, tired or disgruntled.  (6/22/16 Tr. at 21-22, 26-27).  Although having no reason to anticipate being interviewed, Defendant did not appear nervous or apprehensive.  (6/22/16 Tr. at 27, 32).  At the conclusion of the interview, Defendant was released and admitted as a United States citizen; however, at the request of Special Agent Telfer, Defendant's passport was retained and forwarded to the State Department.  Defendant was advised that he would be contacted about the passport. (6/22/16 Tr. at 21, 35).

Upon completion of the interview with Defendant, Officer Guajardo prepared an email to Ronda Archer, the Fraud Detention National Security ("FDNS") officer located at the airport, advising her about the interview to let her know that he would be forwarding documents to her.[7]  (6/22/16 Tr. at 12-16, 22-24, 31-32; Gov't Exh. 3). The email, dated April 21, 2014, with the time 10:51 a.m., provides information about Defendant's arrival and biographical information as well as bullet points of the information related by Defendant during the interview.  (6/22/16 Tr. at 23-24, 31-33; Gov't Exh. 3).  The officer, who does not keep a copy of the documents, then

_____

[7]Besides the Form I-214, the officer also provides to the FDNS officer a "Word" document that contains the interviewee's responses to the questions asked during the interview.  (6/22/16 Tr. at 12-16).

7

personally delivered the Form I-214 and the Word document to Ms. Archer.  (6/22/16

Tr. at 16, 23-24, 31-32).[8]

On October 14, 2015, at the HSI office located in East Point, Georgia, USCIS

Officer Lee, a member of the Document Benefit Fraud Task Force ("DBFTF"), and

Special Agent Gary Thiel, also a member of the DBFTF, met with Defendant Sanyaolu

and Peter Tadeo[9] for an interview regarding a I-129 petition[10] filed by Defendant.

(8/12/16 Tr. at 9, 6-7).  Months before the interview, Officer Lee, who is not a law

enforcement officer but handles administrative duties regarding benefits, such as visas,

---

[8]Although a diligent and thorough search was conducted by Richard Lee, a United States Citizenship and Immigration Services ("USCIS") national security officer, of the Department of Homeland Security ("DHS") data bases using various identifiers and search terms (as well as checking available paper files), the Form I-214 and Word document created on April 21, 2014, by Officer Guajardo has not been located.  (6/22/16 Tr. at 40-44).  Officer Guajardo testified to the events of the interview based on his recollection, his usual practice and the information in the email he prepared at the end of the interview.  (6/22/16 Tr. at 32, 35).

[9]Officer Lee understood that Tadeo was a lawyer with the law firm of George Lee, who had filed the I-129 petition on Defendant's behalf.  Tadeo presented a business card for the law firm with his name, Peter Tadeo, followed by the word, "Associate."  (8/12/16 Tr. at 7-8, 11, 24-26, 32, 38-39; Gov't Exh. 5).  The presence of an attorney was not required for the interview.  (8/12/16 Tr. at 40, 42).  If Tadeo was not Defendant's attorney, then Defendant was allowed to have any representative he wished in attendance at the interview.  (8/12/16 Tr. at 10-11, 31-32, 40).

[10]This petition is used by an United States citizen to seek a visa for a non-resident/non-citizen fiancee.  (8/12/16 Tr. at 5-6).

had been investigating the I-129 petition filed by Defendant to verify Defendant's citizenship (a requirement to file the petition) and the validity of the petition. (8/12/16 Tr. at 5-7, 22). HSI had alerted Officer Lee to the petition due to "derogatory" information in Defendant's file, that is, Defendant's use of another identity when entering the United States. (8/12/16 Tr. at 6-7, 20-22).

Agent Thiel contacted Officer Lee a day before the interview and advised that Defendant and his attorney would be attending to discuss the I-129 petition.[11] (8/12/16 Tr. at 21, 23-25, 32). Officer Lee, who was in charge of conducting the interview as it involved a matter within the scope of his administrative duties, and the agent met Defendant and Tadeo in the public lobby of the HSI office. (8/12/16 Tr. at 7-10, 14, 35). After verifying Defendant's and Tadeo's identities, the interview was conducted in a room just off the lobby. (8/12/16 Tr. at 8, 12). The room's door exiting to the lobby was not locked, but a second door to the interior of the HSI office was locked.

---

[11]On cross-examination, Defendant's counsel asked Officer Lee a number of questions about what Agent Thiel might have or might not have said to Defendant or his attorney in setting up the interview. (8/12/16 Tr. at 23, 33-34). Officer Lee's responses indicated that he did not know what was said by Agent Thiel or to whom about the nature of the interview and the topics for discussion. (8/12/16 Tr. at 23, 33-34). Officer Lee understood that the interview was being conducted due to the filing of the I-129 petition (8/12/16 Tr. at 7, 23, 34); however, there is no evidence before the court regarding what Agent Thiel said to Defendant.

9

(8/12/16 Tr. at 12).  Defendant sat near the unlocked door.  (8/12/16 Tr. at 12-13).  The officer and agent identified themselves, informed Defendant that the interview would be recorded and that his statements would be sworn.  (8/12/16 Tr. at 13-14). Defendant was also advised that he was free to leave and that the interview was voluntary. (8/12/16 Tr. at 14).  Officer Lee was not armed, and if armed, Agent Thiel's firearm was not visible.  (8/12/16 Tr. at 16).  Defendant was not handcuffed or otherwise restrained.  (8/12/16 Tr. at 17-18).  Defendant did not refuse to answer any questions;[12] he appeared to understand the questions; and he was not agitated.  (8/12/16 Tr. at 18-19).  The interview lasted approximately forty minutes with Officer Lee asking questions initially from a standard "Record of Sworn Statement" form and following up with questions pertinent to the specific petition under review.  (8/12/16 Tr. at 15-16; Gov't Exh. 4).

The questions sought information about Defendant's immigration history, including his earlier entry using another person's (his twin brother's) identity and information not only about his current fiancee but his ex-wife and the I-129 petition filed on her behalf and about other family members.  (8/12/16 Tr. at 27-29, 34; Gov't

---

[12]When asked what might have happened had Defendant refused to answer questions, Officer Lee stated that the I-129 petition might have been denied but that Defendant was not told that might happen.  (8/12/16 Tr. at 18, 33).

AO 72A
(Rev.8/82)

Exh. 4).  Officer Lee testified that, in order to investigate the I-129 form filed by Defendant, due to the derogatory information, he had to verify that Defendant was an United States citizen and that questions about his use of the other identity was pertinent to that investigation separate and apart from any criminal investigation.  (8/12/16 Tr. at 35-38).  Also, questions about Defendant's prior marriage were pertinent because if Defendant was still married, the current petition would be denied.  (8/12/16 Tr. at 36-37).  The officer wrote Defendant's answers to the questions on the "Record of Sworn Statement" form and, at the end of the interview, asked Defendant to review the information on the statement and, if correct, to sign.  Defendant, making no corrections, did so and then left.  (8/12/16 Tr. at 19, 29-31; Gov't Exh. 4).

Additional facts will be set forth as necessary during discussion of Defendant's claims.

## II.   Discussion

### a.   April 21, 2014, Secondary Inspection Interview

Defendant first contends that he was in custody during the secondary inspection conducted at the George Bush Intercontinental Airport following his arrival in the United States from Lagos, Nigeria, and should have been but was not advised of his <u>Miranda</u> rights.  He points to being escorted from primary inspection, probably without

11

being told why, down a hallway to the locked waiting room and being interviewed by an uniformed and armed officer, who had handcuffs and who, after taking Defendant's fingerprints, accused him of committing fraud. [Doc. 33 at 10-11]. The Government, however, contends that the totality of the circumstances do not support a finding that a reasonable person would have believed he was in custody. [Doc. 37 at 9-10]. Both Defendant and the Government fail to cite to or discuss the facts in this case in light of the legal authority that should guide the court in resolving whether a person is in custody, requiring <u>Miranda</u> warnings, at the international border. However, applying that authority, the court finds that Defendant was not in custody requiring warnings. And, even if Defendant was in custody, the court finds that the Government established by a preponderance of the evidence that he was advised of and waived his rights before being questioned.

In <u>Miranda v. Arizona</u>, 86 S. Ct. 1602 (1966), the Supreme Court held that "a person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" <u>Stansbury v. California</u>, 114 S. Ct. 1526, 1528 (1994)

12

(quoting <u>Miranda</u>, 86 S. Ct. at 1612).  The Supreme Court subsequently clarified "that the freedom-of-movement test identifies only a necessary and not a sufficient condition for <u>Miranda</u> custody."  <u>Maryland v. Shatzer</u>, 130 S. Ct. 1213, 1224 (2010).  The Court stated, "We have declined to accord it 'talismanic power,' because <u>Miranda</u> is to be enforced 'only in those types of situations in which the concerns that powered the decision are implicated.'"[13] <u>Id.</u> (quoting <u>Berkemer v. McCarty</u>, 104 S. Ct. 3138, 3148-49 (1984)).  Accordingly, "[a]n officer's obligation to administer <u>Miranda</u> warnings attaches . . . only where there has been such a restriction on a person's freedom as to render him in custody."  <u>Stansbury</u>, 114 S. Ct. at 1528 (quoting <u>Oregon v. Mathiason</u>,

---

[13]Applying this test to an investigative detention, the Eleventh Circuit Court of Appeals explained:

> [A]lthough a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment – and thus may be deemed to have been "seized" by law enforcement – he will not necessarily be considered in "custody" for Fifth Amendment purposes. . . .

> Rather, "a free-to-leave inquiry reveals *only* whether the person questioned was seized.". . . While "seizure is a necessary prerequisite to <u>Miranda</u>, . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed *to a degree associated with formal arrest*."

<u>United States v. Luna-Encinas</u>, 603 F.3d 876, 881 (11th Cir. 2010) (citations omitted; emphasis in original).

AO 72A
(Rev.8/82)

97 S. Ct. 711, 714 (1977) (per curiam)) (internal quotation marks omitted);

accord United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006).

This determination "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury, 114 S. Ct. at 1529; and see United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006) (same). While "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned[,]" Stansbury, 114 S. Ct. at 1530, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was in custody at a particular time . . .," United States v. Lall, 607 F.3d 1277, 1284 (11th Cir. 2010) (citation and internal quotation marks omitted). "[U]nder the objective standard, the reasonable person from whose perspective custody is defined is a reasonable innocent person." Street, 472 F.3d at 1309 (citation and internal quotation marks omitted); see also Brown, 441 F.3d at 1347 (same); United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996) ("Whether a defendant knows he is guilty and believes incriminating evidence will soon be discovered is irrelevant.").

And the circumstances before the court fall outside "the Miranda paradigm[,]" that is, interrogation of a suspect at the police station, United States v. Ellison, 632

14

F.3d 727, 729 (1st Cir. 2010), requiring <u>Miranda</u> warnings.  In this case, Defendant was seeking admission into the United States at the functional equivalent of the border, <u>see</u> <u>United States v. Buonsignore</u>, 131 Fed Appx. 252, 257 (11th Cir. 2005), and was being interviewed by a CBP Officer as part of his responsibility in protecting the border in connection with that request, <u>see</u> <u>United States v. Garcia-Cordero</u>, 610 F.3d 613, 618 (11th Cir. 2010) (discussing the requirements of 8 U.S.C. § 1324(a)(2)(B)(iii), the "bring and present" regulation, the court agreed with the Government's assertion "that identifying and questioning individuals who enter our country is essential to controlling our borders, which is a critical national security issue").  Although individuals "at the border are entitled to <u>Miranda</u> warnings before custodial interrogation[,]" the court's determination "whether interrogation is 'custodial' should be interpreted in the light of the strong governmental interest in controlling the borders."  <u>Moya</u>, 74 F.3d at 1119; <u>accord</u> <u>United States v. McDowell</u>, 250 F.3d 1354, 1362 (11th Cir. 2001) (same).

Given this responsibility, the court in <u>Moya</u> stated:

> [S]ome degree of questioning and of delay is necessary and is to be expected at entry points into the United States.  Because of this expectation, questioning at the border must rise to a *distinctly accusatory level* before it can be said that a reasonable person would feel restraints on his ability to roam to the "degree associated with formal arrest."

15

> [Minnesota v.] Murphy, [104 S. Ct. 1136, 1144, (1984)].  We stress that
> events which might be enough often to signal "custody" away from the
> border will not be enough to establish "custody" in the context of entry
> into the country.  This idea is consistent with cases involving facts similar
> to this one, which have indicated that a secondary interview is part of the
> border routine and does not require Miranda warnings.

74 F.3d at 1120 (emphasis added) (citing, e.g., United States v. Henry, 604 F.2d 908,

920 (5th Cir. 1979) ("The referral of a person entering this country to a secondary

inspector is part of the 'routine' border interrogation and does not, in and of itself,

focus on the person so as to require a Miranda warning."), abrogated on other grounds

United States v. Corral-Franco, 848 F.2d 536 (5th Cir. 1988)); accord United States v.

Medina, 167 Fed. Appx. 161, 166 (11th Cir. 2006) (same); McDowell, 250 F.3d at 1362

(same); and see United States v. Hernandez, 229 Fed. Appx. 331, 332 (5th Cir. 2007)

("Referral to secondary inspection at a border check-point does not constitute an arrest

requiring Miranda warnings."); United States v. Masesa, 218 Fed. Appx. 880, 882 (11th

Cir. 2007) (finding that both the primary inspection and the secondary inquiry "were

part of the initial border investigation[,]" the court stated that "[t]his second phase of

inquiry was merely an extension of the initial border search . . ."); Buonsignore, 131

Fed. Appx. at 258 ("we have held that 'a secondary interview is part of the border

routine and does not require Miranda warnings'") (citation omitted).

16

The courts in <u>McDowell</u> and <u>Moya</u>, and courts more recently addressing this issue, considered the following factors to determine that the defendant was not in custody when questioned at the border: (1) "he was not physically moved or restrained by officers during the interview," (2) "no handcuffs were employed and no guns were drawn," (3) "he was not booked or told of formal accusations, nor told that he was under arrest" (4) "he did not ask to leave and was not told that he was not free to do so," and (5) "he made no admissions during the interview that would have led a reasonable person in his place to conclude that he would be arrested immediately."[14] <u>McDowell</u>, 250 F.3d at 1362; <u>see also</u> <u>Moya</u>, 74 F.3d at 1119.  Applying these factors to this case establishes that Defendant was not subjected to custodial interrogation during the secondary interview.

Defendant was not physically moved or restrained by any CBP Officer during either the primary or secondary inspections.  Although Defendant was escorted to the

---

[14]And, while noting that "there is no fixed limit to the length of questioning[,]" <u>McDowell</u>, 250 F.3d at 1363, the Eleventh Circuit Court of Appeals in both <u>Medina</u> and <u>McDowell</u> found that delays of one and a half hours and approximately four hours, respectively, did not cause the border inquiry to rise to the "accusatory level" requiring <u>Miranda</u> warnings. <u>Medina</u>, 167 Fed. Appx. at 166; <u>McDowell</u>, 250 F.3d at 1363.  In this case, the interview at secondary inspection lasted approximately one hour. (6/22/16 Tr. at 25).

17

secondary inspection area and was not free to leave the inspection area,[15] those circumstances are applicable to all deplaning international passengers until the determination is made that the passenger may be admitted into the United States. (6/22/16 Tr. at 5-10).  And passengers referred to secondary inspection may still be admitted, as was the case with Defendant Sanyaolu.  (6/22/16 Tr. at 10, 21, 30-31). During the secondary interview, Defendant was seated in an office, with the door closed but not locked.   (6/22/16 Tr. at 10-11, 17-18).   Defendant was never handcuffed, and the officers did not draw their weapons.  (6/22/16 Tr. at 18-19). Defendant never asked to leave and never attempted to leave; he was never advised that he was not free to leave.  (6/22/16 Tr. at 18-19, 21-22).  In fact, although Defendant may have been stopped from leaving the secondary inspection area if he had attempted to do so, he was free to get up and leave the interview room.  (6/22/16 Tr.

_____

[15]There is no evidence in the record that Defendant was physically restrained or even touched during the walk from the primary to the secondary inspection area nor while Defendant was subject to routine detention in the secondary inspection area.  The mere movement of Defendant, without physical force, does not support a finding that Defendant was in custody.  See United States v. Manta-Carillo, 491 Fed. Appx. 125, 128 (11th Cir. 2012) (the defendant, the captain of a ship entering the port of Mobile, Alabama, from Port au Prince, Haiti, was questioned regarding his possession of child pornography and, although not allowed to leave the ship or the ship to leave the port during the inspection and although the questioning occurred across the hall from his cabin requiring his movement to that location, that restriction and movement did not "support a finding that [he] was in custody . . .").

18

at 8-11, 18).  No CBP Officer booked or arrested Defendant or advised Defendant of any *formal* accusations.  (6/22/16 Tr. at 19-22, 29-31).

The fact that Defendant was advised by Officer Guajardo that Defendant's fingerprints matched a file indicating that he had fraudulently used another person's identity in the past to enter the United States does not constitute a formal accusation of criminal wrongdoing nor did it rise to a "distinctly accusatory level," Moya, 74 F.3d at 1120, of such wrongdoing.  This is true in light of the facts that the officer also advised Defendant that an investigation would be conducted regarding that information and that Defendant was released and admitted into the United States at the end of the interview.  (6/22/16 Tr. at 19, 21, 29-31).  Identifying individuals seeking admission into the United States, which goes hand in hand with determining an individual's intent and purpose for entering the United States, is the primary responsibility of the CBP Officers at the border and that was the underlying purpose of Defendant's interview in secondary inspection.  See Garcia-Cordero, 610 F.3d at 618.

The facts in this case can be compared with the facts before the court in United States v. Jayyousi, 657 F.3d 1085 (11th Cir. 2011), and that comparison leads this court to conclude that nothing about the circumstances of Defendant's interview in this case would cause a reasonable, innocent person to believe that he was in custody.  See

19

Street, 472 F.3d at 1309.   In Jayyousi, the Eleventh Circuit Court of Appeals found that only the final part of a interview at the border rose to the level of custodial interrogation.   Id. at 1109-11.   The events occurred in the Chicago O'Hare International Airport, in the customs inspection area, when customs agents discovered that the defendant was in possession of over $10,000 in currency although on his declaration form he reported only $8,000.  He was escorted by a customs agent to a room to speak with a Federal Bureau of Investigation ("FBI") agent; the defendant was not restrained or handcuffed.[16]   657 F.3d at 1109.   The agent advised that he was seeking the defendant's cooperation to prevent a possible terrorist attack and questioned the defendant about his background and travels.[17]  657 F.3d at 1109.  After

---

[16]Additional background information is outlined in the district court order adopting the recommendation of the magistrate judge to deny the defendant's motion to suppress.  United States v. Padilla, 2006 WL 3678567 (S.D. Fla. November 17, 2006).  Federal law enforcement officers were waiting at the airport for the defendant to arrive from the Middle East and wanted to speak to him about suspected terrorist activities of which he might be aware or involved.  Id., at **7-8.  The interview with the defendant, triggered by the discovery of the currency reporting discrepancy, began at approximately 3:00 p.m. and involved three FBI agents.  Id., at *8.  The interview which lasted "'quite a long time'" was conducted in a conference room with the door closed.  Id.

[17]The initial part of the interview lasted from approximately 3:15 p.m. to 4:25 p.m., and the dinner break - which the defendant apparently took remaining in the conference room except for visiting the restroom - lasted until 5:35 p.m.  2006 WL 3678567, at **8-9.

the dinner break, the defendant indicated a willingness to continue to cooperate, and he answered questions about the false statement on the declaration form.  When the defendant stated that he did not know that making such a statement was against the law and that the amount "was not a 'big deal[,]'" the agent "expressed skepticism . . . ."  Id.  The defendant asked to call his mother but did not press the issue when asked why.  When he stated that he was tired, the agents offered him a motel room for the night but the defendant declined indicating a desire to "'clear this up that day'" and, again, asked to contact his mother but did not pursue the issue.  While continuing to discuss the defendant's travels, the agent asked the defendant about his passport, and the defendant advised that it had been stolen but that he could not recall details.  Id. at 1109-10.  At this point, another break was taken.  Id. at 1110.[18]

The court found that the interview, lasting about three hours, up to this point was "not custodial in nature . . . ."  657 F.3d at 1110 (citing Moya, 74 F.3d at 1119).  The

---

[18]After expressing "skepticism" in response to the defendant's answer to the question about the amount of money, the agent and the defendant discussed how much money public officials make in the Middle East.  The agent also questioned the defendant about the source of the money to which the defendant provided conflicting answers, and the agent "again expressed 'skepticism' and 'pressed' Defendant for details."  2006 WL 3678567, at *9.  When the defendant was unable to provide details about his lost passport, the agent "asked Defendant if he had actually sold the passport, and Defendant said no."  Id.  The break, taken at 6:10 p.m., lasted ten minutes.  Id., at *10.

court noted that Defendant was not handcuffed or physically restrained or moved - even though he was escorted to the conference room and questioned in that room with the door closed for several hours by three federal agents. Id.[19]  And the court found that the agent confronting the defendant "about not telling the truth about the source and purpose of the money that he had failed to declare . . . did not make the interview custodial." 657 F.3d at 1110.  Although the appellate court did not specifically address the impact of the agents' questions about falsely filling out the declarations form or about whether the defendant sold his passport on the interview, those questions involved allegedly criminal conduct and were accusatory in nature.  However, this court notes that it was not until, during the final part of the interview, when the agent "accused [the defendant] of terrorist activities" and the defendant "stood up and announced that the interview was over[,]" that the court found the interrogation

---

[19]The court stated that the defendant was not "'accompanied by uniform officers.'"  Id. (citation omitted).  However, the facts set forth in the district court's opinion indicate that the defendant was "probably escorted by a customs agent" from immigration to the customs area and that the defendant was "brought . . . to the conference room" by an inspector.  2006 WL 3678567, at **7-8.  As was true of Officer Guajardo, the court would expect that the customs agent and inspector were uniform officers.

22

became custodial. Id.[20] The facts relied on by Defendant Sanyaolu, including, being escorted to the secondary inspection area and interviewed for about an hour in the closed but not locked interview room by only Officer Guajardo and Agent Telfer and being advised that his past conduct was fraudulent and would result in an investigation, in light of the facts underlying the court's decision in Jayyousi, simply do not support a finding that Defendant was in custody.

Finally, Defendant did not make any admissions during the interview which would cause him to believe that he would be immediately arrested. Defendant was advised why he was being subjected to the secondary interview, that is, his past use of another person's identity when entering the country. Defendant's explanation about that event, that is, he used his twin brother's identity, does not rise to this level. Defendant had been advised that an investigation would be conducted, and, obviously, Officer Guajardo had information already about Defendant's past conduct. (6/22/16 Tr. at 17, 19, 29-30, 33-34). Questions about Defendant's identity are routine border questions that do not require Miranda warnings. See Buonsignore, 131 Fed. Appx. at 258 (finding that although the defendant was given a secondary examination and asked

---

[20]No additional statements by the defendant were offered after this point in time. Id.

"the same questions every passenger is asked in secondary examination[,]" the defendant "was not in custody at the time of his secondary examination" in a border zone and, thus, "Miranda warnings were not required").

This record does not support a finding that Defendant was subjected to a custodial interrogation during the secondary inspection which would require Miranda warnings. However, even if Defendant was subjected to a custodial interrogation, the court finds that Defendant was advised of his Miranda rights. "Miranda 'warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation.'" United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993) (quoting Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989)). The first question that the court must answer is whether Defendant was advised of his Miranda rights. See United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995) ("The threshold inquiry is whether [the defendant] was informed of his Miranda rights."). In reaching this answer, the Supreme Court stated that it "has never indicated that the 'rigidity' of Miranda extends to the precise formulation of the warnings given a criminal defendant" and that "no talismanic incantation [is] required to satisfy its strictures." California v. Prysock, 101 S. Ct. 2806, 2809 (1981). The answer is to the first question, although disputed by Defendant, is yes.

24

Defendant's arguments challenge the credibility of Officer Guajardo's testimony regarding the events on April 21, 2014.  Defendant asserts, because no written Form I-214 has been located indicating that one was never completed, because the officer had to rely on his email notes and ususal procedures in conducting interviews, and because over two years had passed since the interview, that the court should not credit the officer's recollection of the events.  [Doc. 33 at 9-10].  "Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses."  United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002).  In weighing the credibility of a witness, the court takes "into account the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand."  Id. at 750; see also United States v. Wein, 2006 WL 2128155, at *3 (W.D. Pa. July 27, 2006) (noting that "customary techniques to ascertain the credibility of the witnesses" included, but was "not limited to: appearance and conduct of each witness, the manner in which he testified, the character of the testimony given, his intelligence, motive, state of mind, and demeanor while on the stand").  And, unless the evidence "'is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it" or

25

unless the factfinder's determinations appear to be "'unbelievable[,]'" a reviewing court should accept those findings of fact.  Ramirez-Chilel, 289 F.3d at 749 (citations omitted); accord United States v. Griffith, 397 Fed. Appx. 613, 617-18 (11th Cir. 2010). Having observed Officer Guajardo's testimony and considering the totality of the circumstances, the court finds the officer's recollection of the interview with Defendant credible.

On April 21, 2014, Defendant Sanyaolu was referred to secondary inspection for further questioning regarding his use of another person's identity when previously entering the United States.  (6/22/16 Tr. at 17, 24-25).  Officer Guajardo, who has substantial experience, conducted the interview with Defendant.  (6/22/16 Tr. at 4, 17-18, 28).  Officer Guajardo testified that, if a referral to secondary inspection might ultimately result in criminal charges, as in the referral involving Defendant Sanyaolu, he gives the interviewee Miranda rights using a Form I-214.  (6/22/16 Tr. at 11-12, 18-19; Gov't Exh. 1).  In this case, based on the information about Defendant's prior entry using another person's identity, following the procedure to advise the interviewee, Defendant, of his rights would have been triggered.  The officer, who uses the same procedure in all of his interviews which will not result in an immediate arrest - again the situation involving Defendant (6/22/16 Tr. at 20-21), stated that "[t]o best of [his]

26

knowledge," he used the form with Defendant to advise Defendant of his rights before starting the interview and that Defendant completed the form.  (6/22/16 Tr. at 16, 19, 27-28).  Additional circumstances support this recollection, including, that the officer had a witness, Agent Telfer, present as required when using the Form I-214 and that he followed his usual procedure in such cases of preparing the "Word" document capturing the information discussed and forwarding the Form I-214 and the document to Ms. Archer after sending her an email.  (6/22/16 Tr. at 15-17, 22-24, 31-32; Gov't Exh. 3).  As the Government notes, contrary to Defendant's claim that not finding the Form I-214 indicates no such form was used, a more likely inference is that the form and "Word" document were lost.  The court also notes that the officer's recollection of the events on April 21, 2014, are not disputed by other evidence presented at the evidentiary hearing.

The form used to advise Defendant of his rights states in pertinent part:

Before we ask you any questions, you must understand your rights.
You have the right to remain silent.
Anything you say can be used against you in court, or in any immigration or administrative proceeding.
You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish.

27

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time.  You also have the right to stop answering at any time until you talk to a lawyer.

I have read (or have had read to me) this statement of my rights and I understand what my rights are.

(6/22/16 Tr. at 12-13; Gov't Exh. 1).  Officer Guajardo's usual procedure is to read the form to the interviewee and, if the interviewee understands his rights, have the form executed.   (6/22/16 Tr. at 13-14).   Accordingly, based on the totality of the circumstances, the court finds that Defendant was advised of his <u>Miranda</u> rights.

Having found that Defendant was advised of his rights, the court must next determine whether Defendant voluntarily, knowingly and intelligently waived those rights.[21]  See <u>Barbour</u>, 70 F.3d at 585.

This is a two-part inquiry:

"First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the 'totality of the circumstances surrounding the interrogation' reveal

---

[21]"It is well established that '[t]he government must prove by a preponderance of the evidence that [the defendant] made a knowing, voluntary and intelligent waiver of his <u>Miranda</u> rights.'"   <u>United States v. Chirinos</u>, 112 F.3d 1089, 1102 (11th Cir. 1997) (citation omitted).

> both an uncoerced choice and the requisite level of comprehension may
> a court properly conclude that the Miranda rights have been waived."

Id. (quoting Moran v. Burbine, 106 S. Ct. 1135, 1141 (1986) (internal citations and quotations omitted)); see also United States v. Farley, 607 F.3d 1294, 1326 (11th Cir. 2010) (same).  The totality of all the surrounding circumstances, which a court must evaluate to make these determinations, includes "both the characteristics of the accused and the details of the interrogation." Schneckloth v. Bustamonte, 93 S. Ct. 2041, 2047 (1973); see also United States v. Bernal-Benitez, 594 F.3d 1303, 1319 (11th Cir. 2010) (same).  No single factor is necessarily determinative of the issue whether a defendant voluntarily, knowingly and intelligently waived his rights, but the court must engage in a fact-specific inquiry based on all of the circumstances. See Moore v. Dugger, 856 F.2d 129, 134 (11th Cir. 1988).

With respect to the waiver of Miranda rights, Officer Guajardo testified that, if the individual understands the rights and signs the form, then the waiver of rights provides, "I am willing to make a statement and answer questions.  I do not want a lawyer at this time.  I understand and know what I am doing.  No promises or threats have been made to me and no pressure or coercion of any kind is being used against me."  (6/22/16 Tr. at 14; Gov't Exh. 2).  He recalled that Defendant completed the

29

form. (6/22/16 Tr. at 19). Although Defendant argues that his statement to Officer Guajardo was not voluntary, he does not allege that the waiver of his rights was invalid. [Doc. 33]. The facts as thoroughly discussed *supra* support a finding that Defendant's waiver was knowing, intelligent and voluntary. Furthermore, the absence of a written waiver of rights form does not alter this court's conclusion. A written form is not required to establish that a defendant knowingly, intelligently or voluntarily waived his Miranda rights. The lack of a written waiver does not undermine the validity of an express oral waiver. See, e.g., Bernal-Benitez, 594 F.3d at 1319 ("failing to obtain a signed Miranda waiver alone is not proof that the defendant did not freely and intelligently waive his rights"); United States v. Dowd, 451 F.3d 1244, 1250-51 (11th Cir. 2006) (noting that even a refusal to sign a written waiver of rights form does not establish the absence of a voluntary and knowing oral waiver); United States v. Stephens, 202 F. Supp. 2d 1361, 1370 (N.D. Ga. 2002) (either express oral or written waiver of Miranda rights is strong proof of validity of waiver).

Finally, Defendant's statement to Officer Guajardo was voluntary. The Supreme Court has recognized "that noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear [a defendant's] will

30

to resist and bring about confessions not freely self-determined . . . .'" Beckwith v. United States, 96 S. Ct. 1612, 1617 (1976) (citation omitted).  It is the court's duty "'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.'" Id. (quoting Davis v. North Carolina, 86 S. Ct. 1761, 1764 (1966)). In determining whether a statement was made voluntarily, courts are to evaluate "the totality of all the surrounding circumstances--both the characteristics of the accused and the details of the interrogation." Schneckloth, 93 S. Ct. at 2047.   Those cases where courts have found confessions to be involuntary "all have contained a substantial element of coercive police conduct." Colorado v. Connelly, 107 S. Ct. 515, 520 & n.1 (1986) (citing Mincey v. Arizona, 98 S. Ct. 2408 (1978) (defendant subjected to four hour interrogation while incapacitated and sedated in intensive-care unit); Greenwald v. Wisconsin, 88 S. Ct. 1152 (1968) (defendant, on medication, interrogated for over eighteen hours without food or sleep); Beecher v. Alabama, 88 S. Ct. 189 (1967) (police officers held gun to the head of wounded confessant to extract confession)).  "[F]actors taken into account have included the youth of the accused, . . . his lack of education, . . . or his low intelligence, . . . the lack of any advice to the accused of his constitutional rights, . . . the length of detention, . . . the repeated and prolonged nature of the questioning, . . . and the use of physical

31

punishment such as the deprivation of food or sleep . . . ."  Schneckloth, 93 S. Ct. at 2047 (citations omitted).  "'Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.'"  United States v. Thompson, 422 F.3d 1285, 1295-96 (11th Cir. 2005) (citation omitted).  None of the factors identified by courts finding that a confession is involuntary are present in the instant case.

To support his argument to the contrary, Defendant argues that, because of the long flight from Nigeria, he "was very likely fatigued during" the interview.  [Doc. 33 at 13].  This assertion is wholly speculative and refuted by Officer Guajardo's testimony that Defendant did not appear confused, appeared to understand the questions being asked, did not appear fatigued or tired and was not disgruntled. (6/22/16 Tr. at 21-22, 26).  The other reasons cited by Defendant, that is, that the interview was no doubt unexpected, that he was escorted without explanation to the secondary inspection area and locked in and that he was then accused of having fraudulently used another person's identity [Doc. 33 at 13] do not support a finding that his statement was involuntary.  For the most part, the factors cited by Defendant are part of the routine processes facing individuals seeking permission to enter the

32

United States when questions are raised during the primary inspection process. (6/22/16 Tr. at 5-10). Whether Defendant was advised of his rights or not, the record simply does not support finding that his statement was coerced.

For these reasons, the court finds that Defendant's April 21, 2014, statement is admissible.[22]

### b.      October 14, 2015, Interview

Defendant contends that the non-custodial interview on October 14, 2015, resulted in him making involuntary statements because he was not advised about the scope of the questions to be asked and "was surprised" by questions about his own immigration history and about other family members. He contends that, if he had been apprised of the scope of the questioning, he would have been able to make an informed and intelligent decision about whether to speak to Officer Lee and Agent Thiel. [Doc.

---

[22]Having made this finding, the court will not address Defendant's conclusory contention that the subsequent statement on October 14, 2015, is fruit of the poisonous tree, because the later statement would not have occurred but for his initial admissions. [Doc. 33 at 11]. Without fully addressing Defendant's claim, the court is not quite sure why Defendant would contend that, but for the first statement, he would not have been interviewed about the I-129 petition. The record before the court indicates that the October 2015 interview was triggered by Defendant's prior use of another person's identity to enter the country - a fact known to DHS before his 2014 interview. At the time of the 2015 interview, there was no discussion about Defendant's prior interview in secondary inspection.

33 at 13-14]. First, the court notes that there is *no* evidence in the record that Defendant was "was surprised" by the scope of the questions or that, if so informed, his decision to agree to the interview would have been different. Although Defendant attempted to glean information from Officer Lee regarding what Defendant was told or knew about the scope of the interview, the officer simply did not have that information. On cross-examination, Defendant's counsel asked Officer Lee a number of questions about what Agent Thiel might have or might not have said to Defendant or his attorney in setting up the interview. (8/12/16 Tr. at 23, 33-34). Officer Lee's responses indicated that he did not know what was said by Agent Thiel or to whom anything was said about the nature of the interview and the topics for discussion. (8/12/16 Tr. at 23, 33-34). While Officer Lee understood that the interview was being conducted due to the filing of the I-129 petition (8/12/16 Tr. at 7, 23, 34), there is no evidence before the court regarding what Agent Thiel said to Defendant about the scope of the interview. However, even if Defendant's understanding of the scope of the interview was narrower than the questions being asked, that fact does not render his statements involuntary.

The court has already summarized the law applicable to situations involving challenges to the admissibility of statements made during non-custodial interviews,

34

such as, the one taking place on October 14, 2015. Although a "noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined[,]'" Beckwith, 96 S. Ct. at 1617 (citation omitted), the cases where courts have found confessions to be involuntary "all have contained a substantial element of coercive police conduct[,]" Connelly, 107 S. Ct. at 520 & n.1. The only "coercive" factor that Defendant points to is the alleged failure to be apprised as to the scope of the interview and, apparently, that he was misled as to the nature of the interview.

Because the interview was non-custodial, Officer Lee and Agent Thiel were not required to inform Defendant of his right to remain silent or that any information he provided could be used against him. Likewise, they were not required to provide Defendant with details about the nature of their investigative inquiry. See United States v. Barner, 572 F.3d 1239, 1244 (11th Cir. 2009) ("the Supreme Court has 'never read the Constitution to require that the police supply a suspect with a flow of

information to help him calibrate his self-interest in deciding whether to speak or stand by his rights'") (citation omitted).[23]

If Defendant's argument is interpreted as contending that the agents tricked him into providing information about his immigration status and prior entries into the United States or about his prior marriage, rendering his statements involuntary, that argument likewise fails under the facts of this case. "[T]he law in the Eleventh Circuit is clear, that the police's use of a trick alone will not render a confession involuntary, unless there are *other* aggravating circumstances beyond the mere use of deceptive tactics[.]" United States v. Graham, 2014 WL 2922388, at *10 (N.D. Ga. June 27, 2014) (quoting United States v. Castaneda-Castaneda, 729 F.2d 1360, 1363 (11th Cir. 1984)) (internal quotation marks omitted; emphasis in original). "Indeed, '[c]onfessions are not generally rendered inadmissible merely because they are obtained by fraud, deception, or trickery practiced upon the accused, provided the means employed are not calculated to procure an untrue statement and the confession is otherwise freely and voluntarily made.'" Id. (quoting Moore v. Hopper, 389 F.

---

[23]In the context of a custodial interrogation, the Eleventh Circuit Court of Appeals further explained that a defendant "must simply be aware that he may remain silent and request a lawyer, and that his statements may be used against him." Id.; and see Colorado v. Spring, 107 S. Ct. 851, 857-59 (1987).

AO 72A
(Rev.8/82)

Supp. 931, 934 (M.D. Ga. 1974)); compare United States v. Farley, 607 F.3d 1294, 1328 (11th Cir. 2010) ("Knowledge of what the agents really suspected him of doing would no doubt have been useful, possibly even decisive, to Farley in calculating the wisdom of answering their questions.  But their deception on that point was not 'constitutionally significant,' because the lack of that information did not prevent Farley from understanding the nature of his rights and the legal consequences of waiving them.").  Nothing about the circumstances of the interview on October 14, 2015, evidences any attempt by the agents to coerce Defendant to speak to them, and there are no aggravating facts suggesting that Defendant answered questions unwillingly.

On October 14, 2015, at the HSI office, Officer Lee and Agent Thiel, both members of the DBFTF, met with Defendant Sanyaolu and Peter Tadeo, whom Officer Lee understood to be one of Defendant's attorneys, for an interview regarding a I-129 petition filed by Defendant.  (8/12/16 Tr. at 6-9, 11, 24-26, 32, 38-39; Gov't Exh. 5).  Months before the interview, Officer Lee, who is not a law enforcement officer but handles administrative duties regarding benefits, such as visas, had been investigating the I-129 petition filed by Defendant to verify Defendant's citizenship (a requirement to file the petition) and the validity of the petition due to "derogatory" information in

37

Defendant's file, that is, Defendant's prior use of another person's identity when entering the United States.  (8/12/16 Tr. at 5-7, 20-22).

Officer Lee, who was in charge of conducting the interview as it involved a matter within the scope of his administrative duties, and the agent met Defendant and Tadeo in the public lobby of the HSI office.  (8/12/16 Tr. at 7-10, 14, 35).  After verifying Defendant's and Tadeo's identities, the interview was conducted in a room just off the lobby. (8/12/16 Tr. at 8, 12).  The room's door exiting to the lobby was not locked, and Defendant sat near the unlocked door.  (8/12/16 Tr. at 12-13).  The officer and agent identified themselves, informed Defendant that the interview would be recorded and that his statements would be sworn.  (8/12/16 Tr. at 13-14).  Defendant was also advised that he was free to leave and that the interview was voluntary. (8/12/16 Tr. at 14).  Officer Lee was not armed, and if armed, Agent Thiel's firearm was not visible.  (8/12/16 Tr. at 16).  Defendant was not handcuffed or otherwise restrained.  (8/12/16 Tr. at 17-18).  Defendant did not refuse to answer any questions; he appeared to understand the questions; and he was not agitated.  (8/12/16 Tr. at 18-19).  As Defendant concedes, the interview was non-custodial.

The interview lasted approximately forty minutes with Officer Lee asking questions initially from a standard "Record of Sworn Statement" form and following

38

up with questions pertinent to the specific petition under review. (8/12/16 Tr. at 15-16; Gov't Exh. 4). The questions included seeking information about Defendant's immigration history, including his earlier entry using another person's (his twin brother's) identity and information not only about his current fiancee but his ex-wife and the I-129 petition filed on her behalf and about other family members. (8/12/16 Tr. at 27-29, 34; Gov't Exh. 4). Although Defendant contends that the questions exceeded the scope of interviewing him about the pending I-129 petition, Officer Lee testified that in order to investigate the I-129 form filed by Defendant, when there was derogatory information, he had to verify that Defendant was an United States citizen. Accordingly, questions about Defendant's use of the other identity was pertinent to that investigation separate and apart from any criminal investigation. (8/12/16 Tr. at 35-38). Also, questions about Defendant's prior marriage were pertinent because, if Defendant was still married, the current petition would be denied. (8/12/16 Tr. at 36-37). Officer Lee's testimony about the scope of the questions asked being pertinent to validity of the I-129 petition is substantiated by the "Record of Sworn Statement" form he used which includes questions, apparently asked of all I-129 petitioners, about immigration history, names used, prior marriages, children and other family members

before the officer even started asking questions pertinent to Defendant's current petition.  (Gov't Exh. 4).

The court finds that there is no evidence in the record that either Officer Lee or Agent Thiel misled Defendant about the scope of the interview or that Defendant was "surprised" by the questions being asked.  The record also does not support a finding that the interview covered topics that were not germane to the pending I-129 petition. Finally, the court finds that even if Defendant was somehow misled about the scope of the interview, there were no "'other aggravating circumstances' beyond the mere use of deceptive tactics" that "render[s Defendant's] confession involuntary[.]" United States v. Hunter, 2015 WL 509995, at *12 (N.D. Ga. February 6, 2015) (citation omitted).  For these reasons, the court finds that Defendant's October 14, 2015, statement is admissible.

### c.       Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 13] to suppress statements be **DENIED**.

## III.   Bill of Particulars

In the bill of particulars, Defendant "requests that the government specify with respect to Count One of the indictment the particulars of how his procurement of

40

naturalization and citizenship in the United States was contrary to law." [Doc. 14 at 3].[24]  Defendant offers no further argument or explanation as to why this information is necessary to his preparation for trial.  [Doc. 14].  The Government opposes the bill of particulars asserting that Count One "mirrors the statutory language" of the charged offense, that Defendant was provided with detailed discovery, that the two evidentiary hearings conducted establish Defendant's counsel's "grasp of the charge" in Count One and that Defendant is seeking to have the Government reveal it's case theory. [Doc. 36 at 6-7].  Under the circumstances of this case, the court finds that Defendant has not established that a bill of particulars is required in order for him to prepare a defense to the charged conduct.

"The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense."  United States v. Warren, 772 F.2d 827, 837 (11th Cir. 1985); see also United States v. Hassoun, 477 F. Supp. 2d 1210, 1227-28 (S.D. Fla. 2007) ("A request for bill of particulars is, inter alia, befitting in those instances

---

[24]Defendant also seeks similar information regarding Count Three of the Indictment; however, the Government has dismissed that count.

41

where defendant seeks further clarity and precision with regard to the charges that he is facing in order to adequately prepare a defense."). "Generalized discovery is not the proper function of a bill of particulars." Warren, 772 F.2d at 837 (citing United States v. Colson, 662 F.2d 1389, 1391 (11th Cir. 1981)); see also United States v. Roberts, 174 Fed. Appx. 475, 477 (11th Cir. 2006) (same). While the court "is vested with broad discretion in deciding whether a bill of particulars should be granted[,]" United States v. Cole, 755 F.2d 748, 760 (11th Cir. 1985), "'where an indictment fails to set forth specific facts in support of requisite elements of the charged offense, and the information is essential to the defense, failure to grant a request . . . may constitute reversible error[,]'" Id. (quoting United States v. Crippen, 579 F.2d 340, 349 (5th Cir. 1978)).

Count One of the indictment charges as follows:

On or about July 20, 2009, in the Northern District of Georgia, the defendant, OLU KANNI SANYAOLU, also known as Kunle Sanya Olukanni, did knowingly procure, contrary to law, naturalization by the United States and United States citizenship, in violation of Title 18, United States Code, Section 1425(a).

[Doc. 1-1]. Section 1425(a) provides, "Whoever knowingly procures or attempts to procure, contrary to law, the naturalization of any person, or documentary or other evidence of naturalization or of citizenship . . ." is guilty of an offense against the

42

United States.  18 U.S.C. § 1425(a).  The court finds that Count One of the indictment sufficiently alleges the offense conduct by stating the elements of the offense charged therein.

And the court notes that the fact that discovery materials were provided to Defendant is an appropriate factor to consider in deciding whether a bill of particulars is warranted.  See Roberts, 174 Fed. Appx. at 477 ("A bill of particulars is not required where the information sought has already been provided by other sources, such as the indictment and discovery. . . ."); United States v. Al-Arian, 308 F. Supp. 2d 1322, 1359 (M.D. Fla. 2004) ("a bill of particulars is not typically warranted in so far as it seeks information already available through other sources") (citing United States v. Rosenthal, 793 F.2d 1214, 1227 (11th Cir. 1986) ("Nor is the defendant entitled to a bill of particulars with respect to information which is already available through other sources such as the indictment or discovery and inspection.")).

As the Government outlines, in addition to the factual allegations in the indictment, Defendant was provided with detailed information in discovery, including, copies of Defendant's A-files and fingerprints.  Also, based on the evidentiary hearings conducted, the court is aware that Defendant has copies of his statements to the government and the circumstances of the Government's inquiry into his prior use of

43

another person's identity to enter the United States and into Defendant's citizenship status.  With respect to Defendant's request for an explanation as to "how" his conduct was "contrary to law[,]" the court finds that the request seeks evidentiary detail - in light of the information already set forth in the indictment and provided by the Government in discovery - that is not appropriate in a bill of particulars.  A bill of particulars "'is not designed to compel the government to [provide] detailed exposition of its evidence'" before trial.  Roberts, 174 Fed. Appx. at 477 (citation omitted); and see United States v. Thomas, 2014 WL 2531952, at *12 (N.D. Ga. June 4, 2014) ("[a] bill of particulars is not . . . designed to compel the government . . . to explain the legal theories upon which it intends to rely at trial") (citation and internal quotation marks omitted); United States v. Scrushy, 2004 WL 483264, at *9 n.5 (N.D. Ala. March 3, 2004) ("[T]here is a difference between being surprised by the charge and being surprised by the evidence supporting a charge.  The function of the bill of particulars is to reduce surprise at the *charge*, that is, to enable the defendant to identify what he is alleged to have done in violation of law.  It is not to eliminate surprise with respect to evidence offered in support of a charge that is clearly understood by the defendant.") (emphasis in original).   And, as the Government notes, Defendant's counsel's

44

questioning at the two evidentiary hearings evidenced an understanding of the offenses charged in the indictment.

Furthermore, Defendant seeks the details about the acts in which *he* engaged in commission of the offense charged in Count One. It is doubtful that Defendant could establish that, without the Government providing further details about this evidence, he was not able to prepare a defense to the charged offense or was surprised. In a case where the evidence being sought by a bill of particulars consists of activities in which a defendant participated or witnessed, the defendant "'could hardly have been surprised by the government's proof at trial.'" United States v. Cantu, 557 F.2d 1173, 1178 (5th Cir. 1977) (quoting United States v. Pena, 542 F.2d 292, 293-94 (5th Cir. 1976)); see also United States v. Williams, 113 F.R.D. 177, 179 (M.D. Fla. 1986) (When the information sought involves "events in which one or more of the defendants participated, or which occurred in one or more of the defendants' presence[, t]he Eleventh Circuit has held that this sort of information need not be furnished in a bill of particulars.") (citations omitted).

For these reasons, the court **DENIES** Defendant's motion [Doc. 14] for a bill of particulars.

AO 72A
(Rev.8/82)

## IV.    Conclusion

For these reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 13] to suppress statements be **DENIED** and **ORDERS** that Defendant's motion [Doc. 14] for a bill of particulars be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO RECOMMENDED AND ORDERED** this 14th day of November, 2016.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

46