**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**UNITED STATES OF AMERICA,**

**v.**

**OLU KANNI SANYAOLU,**

**Defendant.**

**1:16-cr-00126-WSD**

## OPINION AND ORDER

This matter is before the Court on Magistrate Judge Janet F. King's Report and Recommendation ("R&R") [39] on Defendant Sanyaolu's ("Defendant" or "Sanyaolu") Motion to Suppress Statements [13] ("Suppression Motion") and Motion for Bill of Particulars [14].  In the R&R, Magistrate Judge King considers Defendant's motion to suppress statements he made (1) when he was referred to United States Custom's secondary inspection upon his entry into the United States from Nigeria and (2) when he was interviewed in reference to an I-214 petition he filed for the issuance of a visa for his fiancée.  He also seeks a particularization of the Count One charge filed against him.

# I.    BACKGROUND

### A.    April 21, 2014, Secondary Inspection

On April 21, 2014, Defendant arrived at the George W. Bush International Airport in Houston, Texas on a flight from Lagos, Nigeria.  (June 22, 2016, Hr'g ("June 22nd Hearing")[1] Tr. [24] ("T1") at 24-26).  At the primary inspection station,[2] Defendant was referred to secondary inspection because the primary inspection records check revealed that there was an open investigation of Defendant for entering the United States previously using immigration documents issued to his twin brother.  (T1 at 30-35).  Defendant was walked down the hall from the primary inspection area to secondary inspection.  (T1 at 7, 17).  Secondary inspection is required when issues regarding a person's eligibility to enter the United States are identified.  (T1 at 7).  Typical questions concern admissibility and citizenship.  (Id.).  Referral might also happen when records identify an outstanding warrant for a person's arrest.  (Id.).

At the Houston airport, the secondary inspection area is not far from primary inspection.  (Id.).  Because secondary inspection often considers whether an

---

[1]     Evidentiary Hearings on the Suppression Motion were held on June 22, 2016, and August 12, 2016 ("August 12th Hearing").
[2]     The primary inspection section of an airport is where international visitors' passports are checked and their identities verified before being allowed to enter the United States.  (T1 at 6).

individual may enter the United States or is required to be detained due to an outstanding warrant, people identified for secondary inspection are escorted to the secondary inspection area. (T1 at 7-8). The area is entered through a secure door manned by a uniformed guard who verifies that the person is being referred for secondary inspection. (T1 at 8). The guard allows entry into and out of the area[3] for security reasons, including to ensure individuals with outstanding warrants or who may be inadmissible for entry into the country are not permitted to depart the area. (Id.).

The secondary inspection area consists of a large waiting room with approximately fifty chairs. (T1 at 9). It also has six individual interview rooms, each of which has a door without a lock. (Id.). Individuals referred for secondary inspection who require more than just document verification are interviewed in an interview room. (T1 at 10).

On April 14, 2014, Defendant was escorted to the secondary interview area where he was interviewed by Fernando Guajardo, an enforcement officer with the United States Customs and Border Protection ("USCBP"). (T1 at 4). Officer Guajardo has served in the USCBP for over ten years. (Id.). He has served as an

---

[3]    Entry and exit is allowed by the guard's use of a push button. (Id.).

3

enforcement officer for approximately seven years.  (Id.).  Officer Guajardo interviewed Defendant in one of the six interview offices.  (T1 at 11).  Officer Guajardo was in uniform and had on him a holstered weapon.  (Id.).  Special Agent Mike Telfer also attended the interview room.  (T1 at 5).  He was dressed in civilian clothes and did not display a visible weapon.  (Id.).  He did not ask any questions during the interview.  (Id.).

Officer Guajardo followed his customary interview procedures to conduct the interview.  (Id.).  He used an I-214 Miranda rights form to advise Defendant that he was being investigated for past immigration fraud and that there was a pending investigation into the matter.  (T1 at 19).  Officer Guajardo then read Defendant his Miranda rights from the I-214 form[4] and had Defendant initial the form to indicate that he had been advised of his rights.  (T1 at 13).  The form was witnessed by Special Agent Telfer.  (Id.).  Defendant waived his rights.  (Id.). Officer Guajardo knew at the time of the interview that Defendant was a United

---

[4]      Officer Guajardo read Defendant his Miranda rights because it is his practice to do so for those "individuals where [he feels] . . . that there might be criminal charges pending or criminal charges are going to be filed in the Southern District of Texas."  (T1 at 14).  He told Defendant that an investigation was going to be initiated.  (T1 at 19).

States citizen and that, under these circumstances, Defendant was going to be

released.[5]  (T1 at 31).

Officer Guajardo conducted the interview.  (Id.).  Defendant did not appear

to be under the influence of a substance.  (T1 at 26).  He answered appropriately

the questions asked of him, did not say he did not understand any questions asked,

and did not appear disgruntled or fatigued from his flight from Nigeria.  (Id.).

When the interview was completed, Officer Guajardo prepared a Word document

of the interview, with the questions asked and Defendant's answers.  (T1 at 20,

22).  Officer Guajardo sent the Word document and the completed I-214 to the

Fraud Detection and National Security ("FDNS") section to be maintained.  (Id.).

He also sent an email to Ms. Archer, an FDNS section officer, along with a short

summary of the interview to give her a heads up about the interview.  (T1 at 22-23,

Ex. 3).  A search of Homeland Security records depositories by a FDNS section

officer did not find the I-214 or Word document prepared by Officer Guajardo.

(Id.).

After Defendant's secondary interview, Defendant was allowed to depart the

terminal and enter the country.

---

[5]    Having reviewed his notes before his testimony, Officer Guajardo stated that
he remembered the details of his interview with Defendant.

B.    October 14, 2015, interview

Defendant filed an I-129 petition for a fiancée immigration visa for Rachel Martins, Defendant's fiancée.  (August 12, 2016, Hr'g Tr. [29] ("T2") at 5, 24).  A United States citizen must file an I-129 petition to obtain a visa for a foreign national that the citizen intends to marry before that individual is permitted to enter the country.  (T2 at 5).  The person petitioning for the visa must be a United States citizen and cannot be then married to another person.  (T2 at 5, 36-37).  As part of the I-129 petition process, immigration officials discovered that Defendant had admitted that he had in the past used another person's identity to enter the United States.  (T2 at 6).  As a result of this discovery, to discuss other matters pertaining to Defendant's I-129 petition, and to verify Defendant's identity, an interview was scheduled with Defendant.  (T2 at 6-7).

Special Agent Gary Thiel of Homeland Security Investigations ("HSI") scheduled the interview with Defendant.   The interview was conducted in a conference room off of the public lobby at the HSI office in East Point, Georgia.  (T2 at 10-12).  The conference room was not locked and was accessible from the public lobby.  (Id.).  Defendant appeared for the interview with Mr. Peter Tadeo.  (Id.).  The interview was conducted by Officer Richard Lee of the United States Citizen and Immigration Service and Special Agent Thiel.  (Id.).  Officer Lee

6

understood that Mr. Tadeo was an attorney from the office of the lawyer who

assisted Defendant to file his I-129 petition.  (T2 at 26).  The business card that

Peter Tadeo presented represented him as an Associate at the Lee & Peynado

Immigration Law Group.[6]  (T2 at 25-26, Ex. 2).  A person who is interviewed by

FDNS is allowed to have another person attend the interview with him, and the

person attending is not required to a lawyer.  (T2 at 10-11).

     During the interview, Defendant sat next to the door to the public lobby.

(T2 at 12).  The interview was recorded and Defendant was aware of the recording.

(Id.).  Defendant was told the interview was voluntary and that he was free to leave

at any time.  (T2 at 14).  Defendant verified his identity by showing his Georgia

driver's license.  (T2 at 8).

     Officer Lee was unarmed and any weapon on Agent Thiel, if there was one,

was not visible.  Defendant did not appear to be under the influence of any

---

6



Peter Tadeo
Associate

2520 Northwinds Parkway
Suite 450
Alpharetta, Georgia 30009
t: (404) 892-8300 f: (770) 670-7665
petert@LeeLawUsa.com

www.LeeLawUsa.com

Se Habla Español

substance, was not agitated, was not uncomfortable, and agreed to respond to questions.  (T2 at 17, 19).  The interview lasted about 40 minutes.  (T2 at 17).  During the interview, Defendant was asked questions about his identity, his citizenship and immigration status, a prior entry into the United States under another person's name, his prior marriage and status, and his petition for Ms. Martins' visa.  (T2 at 24, 27-29).  Defendant gave his responses under oath.  (T2 at 12).  Officer Lee prepared a written statement for Defendant to sign containing the information Defendant provided during the interview.  (T2 at 19).  The statement was presented to Defendant for his review and for any corrections.  (Id.).  Defendant reviewed the statement, did not correct it, and signed it under oath.  (Id.).

C.    Defendant's Objections to R&R

Defendant offers a lengthy list of objections to the R&R.  He asserts the following fact-based objections:

1.    That the R&R states on page 5 that "[b]ecause Defendant was [a] United States citizen, he was not going to be detained but released." (Am. Obj. to R&R [44] ("Obj.") at 1).  Defendant objects that the R&R did not state that Defendant was not advised he would be released.

2.    That the R&R states on page 5 that "[t]he officer . . . uses the same procedure in all of his interviews which will not result in an immediate arrest."  (Obj. at 2).  Defendant contends this statement

8

wrongfully suggests that Defendant's <u>Miranda</u> rights were read to him.

3. That the R&R states on page 8 that "[t]he officer, who does not keep a copy of the document, . . . personally delivered the I-214 and the Word document to Ms. Archer." (<u>Id.</u>).  Defendant contends a <u>Miranda</u> form was not presented to him.  (<u>Id.</u>).

Defendant also objects to the Magistrate Judge's findings in the R&R as

follows:

1. That Defendant "was not in custody when he was questioned by Agent Guajardo and thus that no <u>Miranda</u> warnings were required." (Obj. at 3).  Defendant contends the interview was custodial and without <u>Miranda</u> warnings.  (<u>Id.</u>).  He contends a reasonable person would have felt detained under the circumstances of the April 21, 2014, interview, and that <u>Miranda</u> warnings were required. (<u>Id.</u>).

2. That "the Government established by a preponderance of the evidence that [Defendant] . . . was advised of and waived his <u>Miranda</u> rights before being questioned." (Obj. at 6).  Defendant contends <u>Miranda</u> warnings were not given.

3. That Defendant "knowingly and voluntarily waived his <u>Miranda</u> rights." (Obj. at 7).  Defendant contends <u>Miranda</u> rights were not read to him.

4. That Defendant's "statements to Agent Guajardo were rendered voluntarily." (<u>Id.</u>).  Defendant contends he was subjected to a custodial interrogation without the reading of <u>Miranda</u> rights.

5. That the Magistrate Judge's "conclusion that the fruit-of-the-poisonous tree doctrine would not apply to the October 14th, 2015 interview and require exclusion of it." (Obj. at 8).  Defendant contends the October 15, 2015, interview was based on information unconstitutionally obtained during the April 21, 2014, interview and

his interview statements are not independently based on concerns
about the I-129 petition.

6.     That Defendant's "statements to Officer Lee and Agent Thiel were
rendered voluntarily."  (Obj. at 10).  Defendant contends he was
misled regarding the subject of the October 14, 2015, interview and,
as a result, he did not have a lawyer present and thus was denied
counsel's advice not to answer questions.

7.     That his Bill of Particulars motion was denied.  Defendant contends
"more information is needed for him to be aware of precisely the
conduct on his part which the Government claims to have been
unlawful." (Obj. at 11).

## II.    STANDARD OF REVIEW

After conducting a careful and complete review of the findings and

recommendations, a district judge may accept, reject, or modify a magistrate

judge's report and recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59;

Williams v. Wainwright, 681 F.2d 732, 732 (11th Cir. 1982) (per curiam).  A

district judge "shall make a *de novo* determination of those portions of the report or

specified proposed findings or recommendations to which objection is made."

28 U.S.C. § 636(b)(1).  With respect to those findings and recommendations to

which a party has not asserted objections, the Court must conduct a plain error

review of the record.  United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983).

Here, the Court considers *de novo* those portions of the R&R to which the

Defendant has asserted an objection.  It considers the remainder of the R&R for plain error.

## III.  DISCUSSION

    A.    <u>Fact Objections (Objections 1-3)</u>

A careful review of Defendant's first three fact objections shows that he objects to the Magistrate Judge's interpretation of the facts but not her statement of them.  Defendant first objects to the statement in the R&R that Defendant "was [a] United States citizen, [so] he was not going to be detained but released."  (Obj. at 1).[7]  Defendant objects that the R&R omitted that Defendant was not advised he would be released.  The claimed omission is not a misstatement of fact.  A careful reading of Officer Guajardo's testimony at the June 22nd Hearing supports that this fact statement is accurate.  Officer Guadardo described the purpose of, and procedures used in, secondary interviews.  He stated that the general focus of secondary interviews is to determine if a person is allowed to be admitted into the United States.  A further consideration is whether a person qualified for admission is the subject of an arrest warrant precluding their general release into the country.  If, following the secondary interview, a person is found to be allowed admission

---

[7]    On November 28, 2016, Defendant filed his "Objections to Report and Recommendation" [43], and, the following day, he filed his Amended Objections [44].  The Court considers the November 28th Objections as moot.

and is not subject to detention because of an outstanding warrant, the person is permitted entry. Here, that is what Officer Guajardo expressed. Acknowledging that Defendant was an apparent United States citizen if he was determined to be the person he represented himself to be, and not subject to arrest, he would be allowed admission into the country. The R&R summarizes this testimony accurately. Upon *de novo* review, the Court overrules Defendant's Objection Number 1.

Defendant next objects to the statement on page 5 of the R&R that "[t]he officer . . . uses the same procedure in all of his interviews which will not result in an immediate arrest." (Obj. at 2). Defendant contends this statement wrongfully suggests that Defendant's <u>Miranda</u> rights were read to him. A careful review of Officer Gaujardo's testimony shows Defendant's interpretation of it is misleading. Officer Guajardo explained his process when conducting a secondary interview, a duty he has performed for seven years. He distinguished between those cases in which an outstanding warrant results in an arrest and those when no arrest warrant is outstanding. His general process having been described, Officer Guajardo testified that he followed his general practice in his April 21, 2014, interview of Defendant, an interview he specifically remembered after having reviewed the email he sent to Ms. Archer immediately following the interview. Officer

12

Guajardo, without hesitation, identified the Defendant at the evidentiary hearing, and, having specific memory of the interview, testified that Defendant was read the <u>Miranda</u> rights on the I-214 form.  After a careful review of the direct and cross-examination testimony offered by Officer Guajardo at the hearing, the Court finds his testimony credible and consistent, including that he read Defendant his <u>Miranda</u> rights from the I-214 form.  Upon *de novo* review, the Court overrules Defendant's Objection Number 2.

Defendant next objects to the statement on page 8 of the R&R that "[t]he officer, who does not keep a copy of the document, then personally delivered the I-214 and the Word document to Ms. Archer."  (<u>Id.</u>).  The objection is based on Defendant's contention that a <u>Miranda</u> form was not presented to him. The Court already has found credible Officer Guajardo's testimony that Defendant was read his <u>Miranda</u> rights.  The Court has now also reviewed page 8 of the R&R, and the transcript of Officer Guajardo's testimony at the June 22nd Hearing.  The Court finds that Officer Guajardo testified that his custom and practice is to send a copy of the I-214 and the Word document summarizing the interview to Ronda Archer, the FDNS officer at the airport in Houston.  Officer Guajardo testified that he sent an email to Ms. Archer giving her notice about the results of the interview with Defendant and then he "would have forwarded over the I-214, and the Q. and A."

(T1 at 31-32).[8]  Having conducted its *de novo* review, the Court overrules Defendant's Objection Number 3, but qualifies it by stating that the I-214 and summary were delivered by a means other than "personal" delivery.[9]

B.    Custodial Interrogation and Miranda Warnings

Defendant's Objections 5 through 7 are founded on Defendant's argument that Defendant was in custody when he was interviewed on April 21, 2014, and was not given Miranda warnings, thus making his statements inadmissible.

It is well established that a person in custody is required to be given Miranda warnings by an investigating law enforcement officer.  "A person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney either retained or appointed.'"  Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting United

---

[8]    Defendant apparently contends that the failure to find a copy of the I-214 form in the Department of Homeland Security databases disputes that it was used and signed by the Defendant during the April 21, 2014, interview.  The credibility and consistency of Officer Guajardo's testimony about his regular practice of forwarding the I-214 and summary of testimony is corroborated by the email introduced at the evidentiary hearing as Exhibit 4.  This evidence supports that the Government has shown by a preponderance of the evidence that Officer Guajardo followed his normal procedures during the April 14, 2014, interview of Defendant including by reading the I-214 Miranda advisements to him.

[9]    There is no evidence of "personal" delivery to Ms. Archer.

States v. Miranda, 384 U.S. 436, 444 (1966)).  Warnings are required to be given

"only in those types of situations in which the concerns that powered the [Miranda]

decision are implicated."  Maryland v. Shatzer, 559 U.S. 98, 112 (2010) (quotation

omitted).  Put another way, "[a]n officer's obligation to administer Miranda

warnings attaches . . . only where there has been such a restriction on a person's

freedom as to render him 'in custody.'"  Stansbury, 511 U.S. at 322 (quoting

Oregon v. Mathiason, 429 U.S. 492, 495 (1977)); United States v. Brown, 441 F.3d

1330, 1347 (11th Cir. 2006).

Our Circuit has evaluated what detention is sufficient to require Miranda

warnings.  In United States v. Luna-Encinas, 603 F.3d 876, 881 (11th Cir. 2010),

the Court stated that although "a reasonable person . . . may feel constrained not to

leave the scene of a police encounter at a particular moment—and thus may be

deemed to have been 'seized' by law enforcement—he will not necessarily be

considered in 'custody' for Fifth Amendment purposes."  Id. at 881.  The Court

continued:  "a free-to-leave inquiry reveals *only* whether the person questioned was

seized."  Id.  "While 'seizure is a necessary prerequisite to Miranda, . . . a court

[must] ask whether . . . a reasonable person would have understood his freedom of

action to have been curtailed *to a degree associated with formal arrest*."  Id.

(emphasis in original) (internal quotation marks omitted).

Determining whether a person is in custody for the purpose of Miranda also "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury, 511 U.S. at 323; United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006); United States v. Lall, 607 F.3d 1277, 1284 (11th Cir. 2010) (police officers' unstated plan not material to whether a person is in custody at a particular time).

These contours are also subject to the public policy concerns that undergird our laws governing border security, including airports which are the functional equivalent of our borders.  United States v. Buonsignore, 131 F. App'x 252, 257 (11th Cir. 2005); see also United States v. Garcia-Cordero, 610 F.3d 613, 618 (11th Cir. 2010) ("identifying and questioning individuals who enter our country is essential to controlling our borders, which is a critical national security issue."). Whether people "at the border are entitled to Miranda warning before custodial interrogation" depends on "whether interrogation is 'custodial' . . . [and that] should be interpreted in the light of the strong government interest in controlling the borders."  United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996).  The Moya court observed:

> [S]ome degree of questioning and of delay is necessary and is to be expected at entry points into the United States.  Because of this expectation, questioning at the border must rise to a *distinctly accusatory level,* before it can be said that a reasonable person would

> feel restraints on his ability to roam to the "degree associated with formal arrest."

Id. at 1120.  Our Circuit, in Moya, applied this reasoning in the context of a secondary inspection at the border:

> We stress that events which might be enough to signal "custody" away from the border will not be enough to establish "custody" in the context of entry into the country.  This idea is consistent with cases involving facts similar to this one, which have indicated that a secondary interview is part of the border routine and does not require Miranda warnings.

Id.; see also United States v. Medina, 167 F. App'x 161, 166 (11th Cir. 2006) (secondary inspections do not require Miranda warnings because they are part of the border routine); United States v. McDowell, 250 F.3d 1354,1362 (11th Cir. 2001); United States v. Hernandez, 229 F. App'x 331, 332 (5th Cir. 2007) (secondary inspection is not an arrest requiring Miranda warnings); United States v. Masesa, 218 F. App'x 880, 882 (11th Cir. 2007) (primary and secondary inspections are part of the border investigation and the secondary phase is an extension of the initial boarder search).  In evaluating whether a boarder inspection exceeds the allowed restraint on an individual to make the approach entry inquiry, our Circuit offers the following evaluation criteria:  (i) whether the individual was "physically moved or restrained by officers during the interview," (ii) whether handcuffs or drawn guns were used, (iii) whether the individual was booked or told

of formal accusations against them, and (iv) whether admissions were made by the individual during the interview that would have led a reasonable person to conclude the individual would be arrested immediately.[10]

These criteria, applied here, show that Defendant was not restrained in a way or for a length of time that his secondary inspection became "custodial" requiring that Miranda warnings be given to Defendant.  Defendant was interviewed in an unlocked room next to a large reception area.  He was not restrained, no guns were drawn, and he was not accused of any wrongdoing.  Although questioned whether he used the identify of another person on a previous occasion, that was done so to confirm Defendant's identity for the purpose of determining his eligibility for admission into the country upon his return from Nigeria.  A guard did control entry into and egress from the secondary inspection area for the safety of others and to ensure that those under warrant, and those not determined to be admissible, could not leave.  A reasonable person would have understood the public policy purposes of this control.  It is not reasonable or plausible that a person would think that everyone entering the waiting area for inspection was being accused.  The door

---

[10]   The Court in McDowell stated there is "no fixed limit to the length of questioning" to determine if an inspection constituted a detention requiring warnings.  McDowell, 250 F.3d at 1363.  The Court in two cases found that delays of one and a half and four hours did not rise to the "accusatory level" requiring Miranda warnings.  Id.; Medina, 167 F. App'x at 166.

control did not convert the secondary inspection process into the accusatory detention of all of those for whom secondary inspection was required.  The secondary inspection here was simply part of the broader routine process.  On *de novo* review, the Court overrules Defendant's Objection Numbers 5 through 7 to the Magistrate Judge's finding that Defendant was not in custody.

The Court finds further that even if Defendant had been in custody during his secondary inspection,—which the Court finds he was not—Defendant's Miranda rights were read to him.  As the Court noted before, Officer Guajardo reviewed the email he prepared and sent to Officer Archer immediately following his interview of Defendant on April 21, 2014.  This review refreshed his memory of the Defendant's secondary inspection interview and reminded Officer Guajardo how the interviewed was conducted, what he did, and with whom the interview was conducted.  Officer Guajardo, without hesitation, identified Defendant at the hearing, provided his account of the interview, the email he sent to Officer Archer, and that he prepared, read and had Defendant acknowledge that he had been read and understood the rights he had as described in the I-214 form used during the interview.  The fact the I-214 form and Word document were not discovered in Homeland Security electronic storage does not discredit the testimony given by Officer Guajardo that the rights were read.

19

Based on the testimony of Officer Guajardo, his email to Officer Archer, his credibility and his recollection of the interview, the Court finds, on *de novo* review, that the Government has shown, by a preponderance of the evidence, that Defendant read, understood, and acknowledged his rights under Miranda. Defendant's Objections Number 5 through 7 to the findings in the R&R that Defendant was read, understood, and acknowledged his Miranda rights are overruled.

      C.     October 14, 2015 Interview

          1.     Fruit-of-the-Poisonous Tree (Objection 8)

Defendant argues that the interview conducted on October 14, 2015, was either a continuation of, or based on, inadmissible evidence developed during the interview of Defendant during the secondary inspection conducted on April 21, 2014, at which, Defendant argues, he was not given Miranda warnings. He argues that his statements at the October 14, 2015, interview are thus the fruit of the poisonous tree and are required to be suppressed. The Court, having found that Defendant was not entitled to Miranda warnings at the April 14, 2014, interview and, even though not required, was, in fact, given the warnings, the fruit of the poisonous tree doctrine does not apply. Upon *de novo* review, the Court overrules Defendant's Objection Number 8.

### 2.    Misleading Purpose of Interview (Objection 9)

Defendant next claims that statements he made during his non-custodial interview on October 14, 2015, are required to be suppressed, because he was not told the scope of the questions he would be asked and because he was surprised by questions about (i) his own immigration history and (ii) his family members and his relationship to them.  The record evidence does not support that Defendant was surprised about the questions he was asked on October 14, 2015.  He did not express any surprise to Officer Lee and Agent Thiel, who interviewed him, and they did not testify that he acted "surprised" by the questions.  There also is no evidence that Defendant was told the subjects that would be asked.  The evidence is that Defendant had filed an I-129 petition for a visa for his then fiancée, Ms. Martins, and that he knew this was the purpose of the interview.  For this reason this objection is required to be overruled because these is no record support for it.

Second, although Defendant knew the purpose of the interview and that it was a response to a visa petition he filed, there is no requirement that the Government advise a petition filer of the specific subjects that will be addressed at the interview.  Here, importantly, the subjects that were addressed at the interview

all specifically related to whether there was a proper basis to grant the petition Defendant requested.

A person being interviewed by enforcement officers is not required to be told of the questions or subjects the person will be asked.  Our Circuit has acknowledged the fundamental principle that the Constitution does not "'require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.'" United States v. Barner, 572 F.3d 1239, 1244 (11th Cir. 2009) (citing Moran v. Burbine, 475 U.S. 412, 422 (1986)).  This principle applies even where law enforcement officers trick a suspect into providing information.  See United States v. Castaneda-Castaneda, 729 F.2d 1360, 1363 (11th Cir. 1984); United States v. Graham, 2014 WL 2922388, at *10 (N.D. Ga. June 27, 2014).

There was, of course, no trick or deception here.  To the contrary, Defendant knew the purpose of the interview and was the moving force to require it, having filed his I-129 visa petition.  He, thus, knew the subject of Officer Lee's and Agent Thiel's inquiry.  Officer Lee was the only person to ask questions.  Agent Thiel attended only because an interview witness was required to attend.  (T2 at 9-10). Officer Lee's questions focused on the merits and basis of the Defendant's petition. Questions were asked about Defendant's former spouse because a married

petitioner cannot be issued a visa petition for a purported fiancée.  Defendant was asked about his prior use of another person's identity because the petition investigation required Officer Lee to verify the true identity of the Defendant and, to do so, Officer Lee had to resolve the derogatory information about Defendant using another person's identity in the past.  The subjects covered by Agent Lee were customary areas covered with all I-129 petitioners and tracked the questions in the "Record of Sworn Statement" form Officer Lee and others use to conduct and record I-129 interviews.  (T2 at Ex. 4).  There simply is no evidence that Defendant was misled about the interview scope and the interview was directed at issues related directly to Defendant's fiancée visa petition.

The Court, having conducted its *de novo* review, overrules Defendant's Objection Number 9.

D.    Bill of Particulars (Objection 10)

Finally, Defendant objects to the Magistrate Judge's denial of his Motion for Bill of Particulars [14].  Defendant seeks a bill of particulars requiring the Government to particularize for Count One how his procurement of naturalization and citizenship in the United States was contrary to law.

The purpose of a bill of particulars "is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to

minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense." United States v. Warren, 772 F.2d 827, 837 (11th Cir. 1985).  Where a bill of particulars is requested, it should be allowed "where an indictment fails to set forth specific facts in support of requisite elements of the charged offense, and the information essential to the defense." Id. (quoting United States v. Crippen, 579 F.2d 340, 349 (5th Cir. 1978)).

Count One of the indictment charges:

On or about July 29, 2009, in the Northern District of Georgia, the Defendant, OLU KANNI SANYAOLU, also known as Kunle Sanya Olukanni, did knowingly procure, contrary to law, naturalization by the United States and United States citizenship, in violation of Title 18, United States Code, Section 1425(a).

([1]).  Defendant has been provided a variety of information about the evidence known to the Government in relation to the charge alleged in Count One.  These facts, the Government represents, were provided in the discovery given to Defendant and developed during the interviews of the Defendant on April 14, 2014, and October 14, 2015.  It is well-established that a bill of particulars is not required where the information sought has already been provided by other sources, such as the indictment, discovery, and, as here, previous interviews. See United States v. Roberts, 174 F. App'x 475, 477 (11th Cir. 2006); United States v. Rosenthal, 793 F.2d 1214, 1227 (11th Cir. 1986).

The Government here has provided in Count One an adequate description of the elements that must be proved at trial.[11]  The Court also determines from its review just of the transcripts of the testimony at the evidentiary hearings on the pending motions and the charge alleged in Court One, that Defendant is aware that the Government has evidence that Defendant previously entered the United States under his twin brother's identity and that the Government contends he used this identity to procure naturalization and citizenship.

The Court determines that the Magistrate Judge's decision to deny Defendant's Motion for Bill of Particulars was not in error.  Objection Number 10, thus, is overruled.

## IV.   CONCLUSION

Based on the reasons stated above,

**IT IS HEREBY ORDERED** that Defendant's Amended Objections to Report and Recommendation [44] are **OVERRULED**.

**IT IS FURTHER ORDERED** that Magistrate Judge Janet F. King's Report and Recommendation [38] is **ADOPTED.**

---

[11]     The Eleventh Circuit Pattern Jury instructions for an offense under Section 1425(a) of Title 18 support that the charge adequately discloses what the Government must prove.

25

**IT IS FURTHER ORDERED** that Defendant's Preliminary Motion to Suppress [13] is **DENIED.**

**SO ORDERED** this 7th day of December, 2016.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE